O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

|  |  |  |
|---|---|---|
| ANDREA SPIEGLER and PNINA BOUSKILA, | ) ) ) | Case No. CV 07-4428 CAS (AJW) |
| Plaintiffs, | ) ) ) ) | AMENDED ORDER GRANTING DEFENDANTS' MOTION TO DISMISS COMPLAINT UNDER FED. R. CIV. P. 9(b) and 12(b)(6) |
| vs. | ) ) | |
| HOME DEPT U.S.A., INC., THE HOME DEPOT, INC., EXPO DESIGN CENTER, and DOES 1-100, | ) ) ) ) | |
| Defendants. | ) ) ) | |

## I.    INTRODUCTION

On June 7, 2007, plaintiff Andrea Spiegler ("Spiegler"), on behalf of herself and all others similarly situated, filed the instant putative class action in the Los Angeles County Superior Court against defendants Home Depot U.S.A., Inc., The Home Depot, Inc., Expo Design Center (the "Home Depot defendants"), and Does 1-100.   On July 9, 2007, defendants removed the action to this Court.  On September 24, 2007, the Court granted defendants' motion to dismiss the complaint pursuant to Fed. R. Civ. P. 9(b), with leave to amend.

On October 31, 2007, plaintiff filed a first amended complaint adding a second named plaintiff–Pnina Bouskila ("Bouskila")–and two defendants–U.S. Remodelers, Inc. and U.S. Home Systems, Inc. (the "Home Systems defendants").

By order dated November 26, 2007, based on a stipulation of the parties, the Court granted plaintiffs leave to file a second amended complaint ("SAC").  On December 21, 2007, plaintiffs filed their SAC asserting claims for (1) unfair and fraudulent business practices in violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 et seq.; (2) violation of California's Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750 et seq.; (3) breach of contract and breach of the implied covenant of good faith and fair dealing; and (4) reformation of contract pursuant to Cal. Civ. Code § 3399.

On or about October 31, 2006, plaintiff Spiegler entered into a written contract with the Home Depot defendants. SAC ¶ 47.  The Spiegler contract, as amended by two change orders dated in November 2006, is attached as Exhibit C to the SAC, and incorporated by reference.  Id. ¶ 17, Ex C (Contract of Andrea Spiegler ("Spiegler Contract")).   Pursuant to that contract, plaintiff Spiegler agreed to pay the Home Depot defendants $11,571 for cabinet refacing work at her home.  SAC ¶ 17.  The parties agreed that Home Depot would order and arrange for the delivery of special order merchandise, and that an independent contractor authorized by Home Depot, an employee of the Home Systems defendants, would install the merchandise in Spiegler's home.  Id. ¶¶ 18, 48-49.  Spiegler paid defendants $11,571 for the refacing work and merchandise as required by the parties' contract.  Id. ¶¶ 48, 51.

On or about November 1, 2006, plaintiff Bouskila entered into a written contract with the Home Depot defendants.  Id. ¶ 55.  The Bouskila contract as amended by a change order dated November 3, 2006, is attached as Exhibit E to the SAC, and incorporated by reference.   Id. ¶¶ 56-57, Ex. E (Contract of Pnina Bouskila ("Bouskila Contract")). Pursuant to that contract, Bouskila agreed to pay the Home Depot defendants $12,610 for cabinet refacing work at her home.  Id. ¶ 56. The parties agreed that Home Depot would order and arrange for the delivery of special order merchandise, and that an independent contractor authorized by Home Depot, an employee of the Home Systems defendants,

would install the merchandise in Bouskila's home. Id. ¶¶ 18, 56, 58. Bouskila paid defendants $12,610 for the refacing work and merchandise as required by the parties' contract. Id. ¶ 58.

The gravamen of plaintiffs' claims is that the Home Depot defendants overcharged plaintiffs for the home improvement goods and services provided to them under their contracts. Plaintiffs allege that defendants based their pricing to plaintiffs on an initial calculation made by one of defendants' sales representatives, while unbeknownst to plaintiffs, defendants based the commission they paid to their sales representatives on a subsequent lower, and allegedly more accurate calculation, made by one of defendants' "Measurement Technicians." In addition, plaintiffs complain about the imposition of a $250 "Administrative Fee" included in their contract price, which was not separately itemized or disclosed in the contract. No portion of the commission paid to sales representatives is based on this $250 "Administrative Fee." Plaintiffs contend that this dual pricing practice, which defendants routinely employ for all of their customers whose jobs are priced at their homes, results in an overcharge because they should have been charged a lower price based on the second calculation.

Plaintiffs claim, among other things, that charging them more than the total of the second calculated amount, excluding the $250 "Administrative Fee," breached their contracts, or was an unfair and fraudulent business practice, and that if the contracts were not literally breached, they should be reformed to reflect plaintiffs' understanding of what the parties intended, which defendants knew or suspected to be the case.

It appears, however, that the written contracts in question, which are on their face agreed to be integrated contracts, do not provide that the goods and services in question would be priced on a time and materials basis, or pursuant to some other formula. Instead, the contracts provide for a total agreed upon fixed-price for the goods and services in question. There is no allegation that what was ordered was not, in fact, delivered, installed, and performed as promised by the defendants. Furthermore, there is no allegation that

defendants deviated from any pre-existing price schedule in calculating the price charged to plaintiffs. Rather, it appears that the difference in the calculated costs of the jobs is due to variations in the calculation made by the sales representative and the Measurement Technician about the amount of time and materials that would be needed to complete the job. For the reasons set forth more fully below, the fact that this second calculated amount is lower than the first calculated amount and was used to compute the sales representatives' commissions does not give rise to any claim by plaintiffs against defendants. Plaintiffs have failed to indicate that, if given the opportunity, they could allege any additional facts to support their claims.

On January 25, 2008, the Home Depot defendants moved to dismiss the SAC pursuant to Fed. R. Civ. P. 9(b) and 12(b)(6), which was joined in by the Home Systems defendants. Plaintiffs filed their opposition on February 15, 2008. On March 10, 2008, the Home Depot defendants filed their reply to plaintiffs' opposition, and an amended notice of motion and motion to dismiss, which was joined in by the Home Systems defendants. A hearing was held on March 24, 2008. Thereafter, the Court took the matter under submission. As noted above, the Court now concludes that this action should be dismissed without leave to amend.[1]

## II.   BACKGROUND

The Home Depot defendants sell and install a variety of home improvement products, including kitchen and bathroom cabinets and cabinet hardware. SAC ¶¶ 13, 17, 21. When a homeowner seeks to utilize defendants' products and services a "Sales Professional," who is an employee of the Home Systems defendants, is dispatched to the customer's home. Id. ¶¶ 21, 26. After suggesting the appropriate type of products and

---

[1] As noted, plaintiffs have attached their contracts as exhibits to their SAC. See Fecht v. Price Co., 70 F.3d 1078, 1080 & n.1 (9th Cir. 1995) (stating that a court may consider contracts attached to the complaint without converting a motion to dismiss into a motion for summary judgment).

materials for the contemplated work, which plaintiffs do not allege they saw at the time of contract formation, the Sales Professional "purports to accurately measure the cabinet space that will be resurfaced and determine the particular installation services necessary for the installation." Id. ¶ 26. Pursuant to defendants' internal pricing policies and procedures, the Sales Professional is required "to accurately calculate and charge no more than [defendants'] standard retail sales price for all cabinet refacing products sold." Id. ¶ 74. Defendants' standard retail prices are allegedly set forth in defendants' "Retail Price List." Id. The Sales Professional then calculates the total amount to charge the customer for the products and installation services. Id. ¶ 28. The Sales Professional has no discretion to modify or negotiate the sales price for any products sold to a customer because those prices are fixed by defendants. Id. ¶ 27. The customer signs a contract memorializing the agreement. Id. ¶ 28. In executing this contract, the customer "reasonably expect[s] and relie[s] on Defendants' Sales Professionals to accurately calculate and charge their fixed, retail sales price based upon the actual quantity of products and services that would be delivered and installed." Id. ¶ 30.

Thereafter, defendants send another agent or employee, a so-called "Measurement Technician," to the customer's home "to purportedly confirm the Sales Professional's measurements and product specifications, as well as to confirm the customer's product specifications and needs." Id. ¶ 37. According to plaintiffs, by sending the Measurement Technician, "[d]efendants falsely represent that the sale and installation of cabinets will be supplied in conformity with the quantity and characteristics reflected in the Contract Selling Price." Id. ¶ 43. Plaintiffs further allege that the Measurement Technician is "authorized and required" to execute "Change Orders" forms and to modify the Contract Selling Price based upon the more accurate measurements. Id. ¶ 38.

Plaintiffs allege that the Home System defendants utilize the Measurement Technician's measurements to calculate the true cost, the so-called "Net Retail Price," for the products and services that the customer will actually receive. Id. ¶¶ 38, 40. Plaintiffs

allege that the Home Systems defendants subtract, from the Net Retail Price, any authorized discounts that were offered by the Sales Professional to the customer and add an "Administrative Fee" of $250, which fee is never disclosed to the customer, to calculate the so-called "Target Selling Price." Id. ¶ 40. According to plaintiffs, the "Target Selling Price represents Defendants' actual and expected standard retail price for the products and services that will be provided." Id. ¶ 41. Plaintiffs allege that defendants internally document when the Target Selling Price is less than the Contract Selling Price, and thereby confirm that they have overcharged their customers. Id. Plaintiffs allege that customers pay the Contract Selling Price, even when the Target Selling Price is less. Id. ¶ 42. According to plaintiffs, defendants do not inform customers of the difference between the Contract Selling Price and the Target Selling Price, nor do they refund the difference. Id. ¶ 43.

## III.   LEGAL STANDARD

### A.   MOTION TO DISMISS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 9(b)

Federal Rule of Civil Procedure 9(b) requires that the circumstances constituting a claim for fraud be pled with particularity. Federal Rule of Civil Procedure 9(b) applies not just where a complaint specifically alleges fraud as an essential element of a claim, but also where the claim is "grounded in fraud" or "[sounds] in fraud." Vess v. Ciba-Geigy Corp. U.S.A., 317 F.3d 1097, 1103-04 (9th Cir. 2003)). A claim is said to be "'grounded in fraud'" or "'sounds in fraud'" where a plaintiff alleges that defendant engaged in fraudulent conduct and relies on solely on that conduct to prove a claim. Id. "In that event, . . . the pleading of that claim as a whole must satisfy the particularity requirement of [Fed. R. Civ. P.] 9(b)." Id. However, where a plaintiff alleges claims grounded in fraudulent and non fraudulent conduct, only the allegations of fraud are subject to heightened pleading requirements. Id. at 1104.

A pleading is sufficient under Fed. R. Civ. P. 9(b) if it "[identifies] the circumstances

constituting fraud so that the defendant can prepare an adequate answer from the allegations." Walling v. Beverly Enterprises, 476 F.2d 393, 397 (9th Cir. 1973). This requires that a false statement must be alleged, and that "circumstances indicating falseness" must be set forth. In re GlenFed Sec. Litig., 42 F.3d 1541, 1548 (9th Cir. 1994). Thus, "[a]verments of fraud must be accompanied by the who, what, when, where, and how of the misconduct alleged." Vess v. Ciba-Geigy Corp. U.S.A., 317 F.3d at 1106 (internal quotation marks and citations omitted). It is not sufficient to merely identify the transaction. Rather "[t]he plaintiff must set forth what is false or misleading about a statement and why it is false." Id. (citations omitted).

## B.    MOTION TO DISMISS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)

A Fed. R. Civ. P. 12(b)(6) motion tests the legal sufficiency of the claims asserted in a complaint. "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1964-65 (2007). "[F]actual allegations must be enough to raise a right to relief above the speculative level." Id. at 1965.

In considering a motion pursuant to Fed. R. Civ. P. 12(b)(6), a court must accept as true all material allegations in the complaint, as well as all reasonable inferences to be drawn from them. Pareto v. F.D.I.C., 139 F.3d 696, 699 (9th Cir. 1998). The complaint must be read in the light most favorable to the nonmoving party. Sprewell v. Golden State Warriors, 266 F.3d 979, 988 (9th Cir. 2001); Parks Sch. of Bus., Inc. v. Symington, 51 F.3d 1480, 1484 (9th Cir. 1995). However, a court need not accept as true unreasonable inferences or conclusory legal allegations cast in the form of factual allegations. Sprewell, 266 F.3d at 988; W. Mining Council v. Watt, 643 F.2d 618, 624 (9th Cir. 1981).

Dismissal pursuant to Rule 12(b)(6) is proper only where there is either a "lack of

a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." <u>Balistreri v. Pacifica Police Dept.</u>, 901 F.2d 696, 699 (9th Cir. 1990).

Furthermore, unless a court converts a Rule 12(b)(6) motion into a motion for summary judgment, a court cannot consider material outside of the complaint (<u>e.g.</u>, facts presented in briefs, affidavits, or discovery materials).   <u>In re American Cont'l Corp./Lincoln Sav. & Loan Sec. Litig.</u>, 102 F.3d 1524, 1537 (9th Cir. 1996), <u>rev'd on other grounds sub nom</u> <u>Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach</u>, 523 U.S. 26 (1998). A court may, however, consider exhibits submitted with or alleged in the complaint and matters that may be judicially noticed pursuant to Federal Rule of Evidence 201.   <u>In re Silicon Graphics Inc. Sec. Litig.</u>, 183 F.3d 970, 986 (9th Cir. 1999); <u>Lee v. City of Los Angeles</u>, 250 F.3d 668, 689 (9th Cir. 2001).

For all of these reasons, it is only under extraordinary circumstances that dismissal is proper under Rule 12(b)(6).   <u>United States v. City of Redwood City</u>, 640 F.2d 963, 966 (9th Cir. 1981).

As a general rule, leave to amend a complaint which has been dismissed should be freely granted. Fed. R. Civ. P. 15(a).  However, leave to amend may be denied when "the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." <u>Schreiber Distrib. Co. v. Serv-Well Furniture Co.</u>, 806 F.2d 1393, 1401 (9th Cir. 1986); <u>see</u> <u>Lopez v. Smith</u>, 203 F.3d 1122, 1127 (9th Cir. 2000).

## IV.   DISCUSSION

### A.   MOTION TO DISMISS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 9(b)

Defendants argue that the SAC should be dismissed under Fed. R. Civ. P. 9(b) for failure to plead with particularity.  The heightened pleading requirements of Rule 9(b) "'must be read in harmony'" with Fed. R. Civ. P. 8(a)'s "short and plain statement of the claim" requirement. <u>Sanderson v. HCA-The Healthcare Co.</u>, 447 F.3d 873, 876 (6th Cir.

2006) (quoting <u>Michaels Bldg. Co. v. Ameritrust Co., N.A.</u>, 848 F.2d 674, 679 (6th Cir. 1988)). Thus, Rule 9(b) is satisfied if the allegations "identif[y] the circumstances constituting fraud (or mistake) so that the defendant can prepare an adequate answer from the allegations." <u>Moore v. Kayport Package Express, Inc.</u>, 885 F.2d 531, 540 (9th Cir. 1989).

Defendants contend that the SAC fails to identify an affirmative representation by either the Sales Professional or Measurement Technician indicating that the Contract Selling Price would reflect a specific quantity of products.

Plaintiffs assert that their claims in the SAC are predicated not on what defendants said, but on what defendants impliedly represented by their conduct. <u>See</u> <u>Thrifty-Tel, Inc. v. Bezenek</u>, 46 Cal. App. 4th 1559, 1567 (1996) ("Misrepresentation need not be oral; it may be implied by conduct."). Plaintiffs have sufficiently identified the conduct that allegedly constitutes an implied misrepresentation, namely the the taking of measurements, the persons who engaged in the conduct, when these persons acted, where they acted, and how their actions constituted a wrongful act, namely failing to lower the contract price based on the more accurate measurement. <u>See</u> <u>Bosse v. Crowell Collier & MacMillan</u>, 565 F.2d 602, 611 (9th Cir. 1977) ("While mere conclusory allegations of fraud will not suffice, statements of the time, place and nature of the alleged fraudulent activities will."); <u>Blake v. Dierdorff</u>, 856 F.2d 1365, 1369 (9th Cir. 1988) (finding that Rule 9(b) satisfied where the complaint provided "specific descriptions of the representations made, [and] the reasons for their falsity"). On the basis of these allegations, defendants can prepare an adequate response. Thus, the Court concludes that plaintiffs have pled fraud with the requisite degree of particularity. Accordingly, the Court denies defendants' motion to dismiss the SAC under Fed. R Civ. P. 9(b).

**B.      MOTION TO DISMISS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)**

**1.      FIRST AND SECOND CLAIMS FOR RELIEF (VIOLATION OF CAL. BUS. & PROF. CODE § 17200)**

Defendants further urge the Court to dismiss plaintiffs' first and second claims, alleging violations of the UCL.

**a.      UNFAIR ACTS AND PRACTICES**

In their first claim for relief, plaintiffs allege that defendants' business practices violate the "unfairness" prong of the UCL.  Specifically, plaintiffs assert that defendants violated the UCL (1) by violating their customer internal pricing policies and procedures that require customers to be charged no more than the standard retail prices set forth in defendants Retail Price Lists, (2) by sending a Measurement Technician to plaintiffs' homes to confirm the quantity and types of materials that will be ordered, delivered, and installed, and failing to adjust the purchase price when the Measurement Technician's more accurate measurements reveal that the Sales Professional's calculation was incorrect, (3) by failing to refund overcharges, and (4) by charging an illusory "Administrative Fee." SAC ¶¶ 74-80.

California's Unfair Competition Law makes illegal "any unlawful, unfair or fraudulent business act or practice."  "[A]n 'unfair' business practice occurs when it offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers."  People v. Casa Blanca Convalescent Homes Inc., 206 Cal. Rptr. 164, 177 (1984) (citing Spiegel, Inc. v. F.T.C., 540 F.2d 287, 298 (7th Cir. 1976)).

As this Court observed in its order dated September 24, 2007, dismissing the original complaint, "California's unfair competition law, as it applies to consumer suits, is currently in flux." Lozano v. AT&T Wireless Services, Inc., 504 F.3d 718, 735 (9th Cir. 2007). California courts have long applied a balancing test.  Under that test, "the determination

of whether a particular business practice is unfair necessarily involves an examination of its impact on its alleged victim, balanced against the reasons, justifications and motives of the alleged wrongdoer.  In brief, the court . . . weigh[s] the utility of the defendant's conduct against the gravity of the harm to the alleged victims."  Motors, Inc. v. Times Mirror Co., 102 Cal. App. 3d 735, 740 (1980).  Then, in Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co., 20 Cal. 4th 163 (1999), the Supreme Court of California rejected this test and held, in the context of an unfair competition claim brought by a competitor, that "any finding of unfairness . . . [must] be tethered to some legislatively declared policy."  Id. at 185.  However, the Cel-Tech court expressly limited its holding to competitor lawsuits.  Id. at 187 n.12.

Since then, some California Courts of Appeal have applied Cel-Tech in consumer actions, while others have declined to do so.  See Paulus v. Bob Lynch Ford, Inc., 43 Cal. Rptr. 3d 148 (2006) (noting split of authority); Progressive W. Ins. Co. v. Sup. Ct., 37 Cal. Rptr. 3d 434 (2005) (same).

In Lozano, recognizing this uncertainty in the law, the Ninth Circuit "endors[ed]" a district court's use of the balancing test.  Lozano, 504 F.3d at 736.  According to the Ninth Circuit, after Cel-Tech, courts faced with consumer lawsuits are left with two options: (1) apply Cel-Tech and require that "unfairness be tied to some 'legislatively declared' policy" or (2) adhere to the balancing test.  Id.  The Ninth Circuit reasoned that "[b]ecause adopting one standard does not necessitate rejection of the other . . . no matter the status of Cel-Tech, the district court did not apply the wrong legal standard" when it applied the balancing test.  Id.

The Court finds that plaintiffs have failed to allege a violation under the unfairness prong applying either test.

Here, plaintiffs have failed to allege a "legislatively declared policy" that defendants' conduct allegedly violates.  See Sept. 24, 2007 Order at 11 (Docket No. 23).  Plaintiffs have again failed to do so.  Plaintiffs do not argue in their opposition, nor did they argue

at the hearing held herein, that they can amend their SAC to make such an allegation.

The Court also concludes that under the balancing test plaintiffs have failed to state a claim for which relief may be granted. Plaintiffs have failed to allege a prima facie case of harm. Plaintiffs entered into written contracts with defendants. Defendants complied with the express terms of the contracts, and charged plaintiffs in accordance with their terms. Plaintiffs have not identified a single false or misleading oral or written representation allegedly made by defendants. Nor have plaintiffs identified any conduct that can constitute deceit. In fact, plaintiffs have failed to point to anything that defendants did or said that would reasonably lead them to believe that the Contract Selling Price would be based on defendants' Retail Price List or that it would be modified upon re-measurement. The "unfairness" prong of the UCL "does not give the courts a general license to review the fairness of contracts." Samura v. Kaiser Found. Health Plan, 17 Cal. App. 4th 1284, 1299 & n.6 (1993). The Court therefore concludes that plaintiffs have failed to state a claim under the "unfairness" prong of the UCL.

Plaintiffs argue that defendants' conduct was unfair because defendants charged plaintiffs for products that they did not provide. This argument is premised on the contention that defendants failed to charge plaintiffs according to the measurements taken by Measurement Technician. However, plaintiffs do not allege that defendants ever promised plaintiffs, expressly or impliedly, orally, in writing, or by their conduct, that they would do so.[2] See also VI.B.3.a. infra (discussing plaintiffs' breach of contract claim). In essence, plaintiffs' claim that the UCL requires defendants to charge them in accordance with the allegedly more accurate measurements taken by the Measurement Technician.[3]

_____

[2] Plaintiffs and defendants agreed that plaintiffs would be charged the Contract Selling Price. That price that was established before the Measurement Technician ever took his or her measurements.

[3] It does not appear that defendants would be permitted to charge plaintiffs in excess of the Contract Selling Price if Sales Professional had under measured.

However, that is not the deal that plaintiffs struck, and the UCL cannot be used to rewrite their contracts or to determine whether the terms of their contracts are fair.

Plaintiffs compare defendants' sale of goods and installation services at their home with defendants' practices concerning the sale of merchandise at a Home Depot retail store and contend that defendants' different practices for in-store sales show that their in-home sales practices are unfair. However, when a customer purchases merchandise at one of defendants' stores, the price tag appears on the merchandise. Obviously, in purchasing products at a store, the customer is charged a price that represents the unit price times the number of units purchased. However, defendants made no similar agreements with these plaintiffs. Instead, defendants promised that they would install particular types of merchandise in a specific area of plaintiffs' homes for a specific total fixed-price. It is undisputed that defendants lived up to their promises. Nor do plaintiffs allege that at the time of making their contracts, they ever saw, were informed about, or had any knowledge of the prices set forth in defendants' Retail Price List.

Additionally, plaintiffs allege that defendants' practice is "unfair" because they do not disclose the basis or nature of the $250 "Administrative Fee" as part of the overall contract price. However, plaintiffs agreed to pay the contract price irrespective of the components included in that price. See Searle v. Wyndham Int'l, Inc., 102 Cal. App. 4th 1327, 1334-35 (2000) (where the plaintiff alleged that in requiring him to pay a seventeen percent service charge and failing to disclose that the service charge is paid to the servers, the defendant hotel violated the UCL, the court concluded that the plaintiff failed to state a cause of action under the "unfairness" prong of the UCL because the service charge is mandatory and not a gratuity, and the service charge did not interfere with a guest's expectations with respect to the custom of tipping so that what the defendant did with the service charge was of no consequence to the plaintiff).

Based on the foregoing, the Court concludes that plaintiffs have failed to state a claim under the "unfairness" prong of the UCL.

### b.   FRAUDULENT ACTS

In the second claim for relief, plaintiffs allege that defendants violated the "fraudulent conduct" prong of the UCL by purporting to take accurate measurements, purporting to charge plaintiffs in accordance with these measurements, sending a Measurement Technician to plaintiffs' homes to take more detailed measurements, which gave the false impression that the Measurement Technician would execute a change order if his measurements revealed that the Sales Professional's measurements were inaccurate, failing to disclose that defendants were charging plaintiffs for products that they did not provide to plaintiffs, and charging an illusory "Administrative Fee" and failing to disclose the nature of and basis for this fee.  SAC ¶¶ 86-89.

Plaintiffs argue that a duty to disclose may arise "'when the defendant had exclusive knowledge of material facts not known to the plaintiff.'"  Opp'n at 22 (quoting Falk v. Gen. Motors Corp., 496 F. Supp. 2d 1088, 1094-95 (N.D. Cal. 2007)).  Plaintiffs allege that defendants had exclusive knowledge of the overcharge and that facts about the overcharge were material because plaintiffs would not have paid defendants if they had been properly informed.

First, plaintiffs' allegation that defendants overcharged them is belied by their contracts.  Plaintiff Spielger agreed to pay defendants $11,571, and defendants charged her $11,571.  SAC, Ex. C (Spiegler Contract) at 1.  Plaintiff Bouskila agreed to pay defendants $12,610, and defendants charged her accordingly.  SAC, Ex. E (Bouskila Contract) at 1.  To the extent that the allegation of an "overcharge" is predicated on defendants' alleged failure to adhere to their internal customer pricing policies, plaintiffs do not allege that defendants were legally obligated to adhere to those policies–policies about which plaintiffs had no knowledge or awareness.  Plaintiffs assert that defendants promised to provide them with a specific quantity of materials, and that this quantity of materials depended on the measurements of their kitchen, taken by the Sales Professional and Measurement Technician.  However, plaintiffs concede

that defendants did not make any representations regarding how they established the price to be charged.

The cases relied upon by plaintiffs to support their allegations of an overcharge are unpersuasive. In <u>People v. Dollar Rent-A-Car Sys.</u>, 259 Cal. Rptr. 191 (1989), the Attorney General of the State of California filed suit alleging that defendants engaged in unfair competition by charging customers a "retail rate" for repairs, which was higher than the actual "wholesale" cost to defendants to repair the cars. <u>Id.</u> at 193. Defendants argued that they did not misrepresent the cost of repairs since they charged customers only what the contract permitted. <u>Id.</u> at 197. The court disagreed, concluding that "it is unreasonable to expect that person to understand he was liable for a sum considerably in excess of defendants' actual repair costs or rental charges." <u>Id.</u>

Plaintiffs contend that, like <u>Dollar Rent-A-Car</u>, defendants here unfairly inflated their contract prices. There is a fundamental difference, however, between <u>Dollar Rent-A-Car</u> and this case: the presence of misleading (or even ambiguous) contractual terms. In <u>Dollar Rent-A-Car</u>, the defendant rental car company sent damaged cars to body shops for repair. <u>Id.</u> at 125. The body shops charged defendants a discounted "wholesale price." <u>Id.</u> However, the rental car company indicated in their contracts and in their invoices that they were charging customers the "retail value" of the repairs. <u>Id.</u> at 129. The court found that this practice led customers to believe that they were being charged only for the actual cost incurred by the rental car company. <u>Id.</u> at 129-30. In this case on the other hand, plaintiffs have failed to identify any allegedly misleading or even ambiguous contractual terms.

Plaintiffs' reliance on <u>McKell v. Washington Mutual, Inc.</u>, 142 Cal. App. 4th 1457 (2006), is similarly unavailing. In <u>McKell</u>, plaintiff consumer alleged that the defendant bank's practice of charging more for underwriting, tax services, and wire transfer fees than the bank actually paid its service providers for those services, violated the "fraudulent conduct" prong of the UCL. <u>Id.</u> at 1465. The trial court sustained

defendants' demurrer without leave to amend.

> The [trial] court explained that plaintiffs' causes of action relied on an
> implied requirement that defendant charge them pass-through costs only.
> "Printing charges for underwriting services, etc. on HUD-1 statements,
> without more, does not create a requirement that Defendants charge
> pass-through costs.  The HUD-1 statements reflect what Washington
> Mutual charges customers for settlement services and not (necessarily)
> what Washington Mutual  pays for those services."

Id. at 1468.

The California Court of Appeal reversed.  The court reasoned that "[l]ooking at these documents, plaintiffs reasonably would conclude that the fees charged were the costs [the bank] incurred in providing these services."  Id. 1472.

Moreover, with respect to materiality, in Falk the court explained, "[i]n order for non-disclosed information to be material, a plaintiff must show that 'had the omitted information been disclosed, one would have been aware of it and behaved differently.'" Id. at 1095 (quoting Mirkin v. Wasserman, 5 Cal. 4th 1082, 1093 (1993)).  For a fact to be material, "members of the public must have had an expectation or an assumption" about the undisclosed fact.  Bardin v. DaimlerChrysler Corp., 136 Cal. App. 4th 1255, 1275 (2006).  Plaintiffs do not allege that they ever saw, were informed about, or had knowledge of the standard retail prices set forth in defendants' Retail Price List or the rates defendants' charged per linear foot.

Similarly, to the extent that plaintiffs' claim is predicated on the charged "Administrative Fees," plaintiffs have failed to sufficiently state a claim for relief.

Based on the foregoing, the Court grants defendants' motion to dismiss plaintiffs' claim under the "fraudulent conduct" prong of the UCL.

### c.   CAUSATION

Finally, defendants argue that plaintiffs suffered no injury as a result of this conduct.  Specifically, defendants argue that "[t]he alleged difference in price between the first and second measurements could not have caused Plaintiffs' harm because the second measurement has not yet occurred at the time Plaintiffs agreed to the fixed-price in the contracts."  Mot. at 22.

In light of the Court's ruling herein, dismissing plaintiffs' claim under the UCL, the Court finds it unnecessary to reach the issue of causation.[4]

### 2.    THIRD CLAIM FOR RELIEF (VIOLATION OF CAL. CIV. CODE § 1770)

Defendants further seek to dismiss plaintiffs' third claim for relief, wherein plaintiffs allege violations of Cal. Civ. Code § 1770(a)(5), (a)(16).

### a.    Cal. Civ. Code § 1770(a)(5)

In plaintiffs' third claim, plaintiffs allege that the following acts violate Cal. Civ.

---

[4] The Court notes that Proposition 64, enacted in November 2004, limits recovery under the UCL to a person who (1) "has suffered injury in fact," and (2) "has lost money or property as a result of such unfair competition."  Cal. Bus. & Prof. Code § 17204; Hall v. Time Inc., 158 Cal. App. 847, 852 (2008), modified by, 2008 Cal. App. LEXIS 139 (2008); see also O'Brien v. Camisasca Auto. Mfg., Inc., 2008 Cal. App. LEXIS 415, at *15-16 (2008) ("Published cases interpreting Proposition 64 have held, either explicitly or implicitly, that to have the requisite standing under the UCL . . . the plaintiff must have spent money, lost money or property, or been denied money to which he or she was entitled, due to unfair business practices or false advertising.").  In Hall, the California Court of Appeal found that Hall could not allege injury in fact because although he spent money by paying Time Inc. $29.51, "he received a book in exchange.  He did not allege he did not want the book, the book was unsatisfactory, or the book was worth less than what he paid for it."  Hall, 158 Cal. App. 4th at 855.  Similarly, although plaintiffs Spiegler and Bouskila spent money, by paying defendants $11,571 and $12,610, respectively, they do not allege that they did not want the merchandise or that the installation services, the merchandise or the installation services were unsatisfactory.  While plaintiffs allege that they paid more than they should have, the Court finds this argument to be unavailing for the reasons discussed herein.

Code § 1770(a)(5)

> [B]y having their Sales Professionals: 1) come to the customer's home; 2)
> display various product choices; 3) purport to measure the applicable
> cabinet surface; and 4) purportedly calculate and charge Defendants'
> standard retail price for the products and installation services sold,
> Defendants expressly or impliedly represent that the customer will receive
> the corresponding quantity of products reflected in the Contract Selling
> Price and that the Contract Selling Price is based on an honest and accurate
> measurement of the linear feet of cabinets to be re-faced.

SAC ¶ 96.

California Civil Code § 1770(a)(5) provides that it is unlawful to "[r]epresent[] that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have."

Plaintiffs assert that defendants had a duty to disclose that they were charging plaintiffs for quantities of products that were not ultimately provided to plaintiffs. Plaintiffs argue that by alleging that defendants failed to disclose this information, the SAC has sufficiently asserted a claim under Cal. Civ. Code § 1770(a)(5). The Court concludes that plaintiffs have failed to identify any promise made by defendants to plaintiffs about the cabinet surface measurements or that a specific quantity of products would be sold. As explained, <u>infra</u>, with respect to plaintiffs' breach of contract claim, plaintiffs have failed to identify a single representation indicating that defendants would recalculate their Contract Selling Price if the Sales Professional's measurements turned out to be inaccurate. Assuming, <u>arguendo</u>, that the Sales Professional represented that the contract price would depend on the measurements he took of plaintiffs' kitchens, plaintiffs do not sufficiently explain why defendants would be required to recalculate the contract price once the Measurement Technician remeasured their kitchens. By plaintiffs' own admission, the Sales Professional came to their home, took

measurements, and proposed a contract price.  Plaintiffs do not allege that the Sales Professional had a practice of intentionally mismeasuring plaintiffs' cabinet surfaces or that the Sales Professional told them they would be receiving a specific quantity of materials.[5]  Plaintiffs agreed to the fixed-contract price.  Defendants refaced plaintiffs' kitchens as they had promised for the agreed upon total contract price.

Because plaintiffs have failed to identify any misrepresentation or actionable omission, the Court concludes that plaintiffs have failed to state a claim under Cal. Civ. Code § 1770(a)(5).

### b.    Cal. Civ. Code § 1770(a)(16)

Plaintiffs allege that defendants violated Cal. Civ. Code § 1770(a)(16) by sending the Measurement Technician to the customer's home to take more accurate measurements, and thereby representing that the "customer will receive the corresponding quantity of products and types of services reflected in the Contract Selling Price."  SAC ¶ 97.  Plaintiffs allege that by failing to enter a change order, defendants "falsely represent that the Contract Price accurately reflects Defendants' actual sales price for the products and services sold."  Id. ¶ 99.

California Civil Code § 1770(a)(16) provides that it is unlawful to "[r]epresent[] that the subject of a transaction has been supplied in accordance with a previous

---

[5] In fact, plaintiffs' allegations suggest the opposite, in that the contracts and sales commissions agreements, attached to and incorporated by reference into the SAC, contemplate circumstances where the second measurement yields a cost that is greater than the sales price agreed to in the contract.  SAC, Ex. B ("Sales Associate and Sales Manager Commission Compensation Plan") at 2 (¶ 3(b)(i) ("If the Contract Price is less than the Target Selling Price then the difference is subtracted from the Base Commission.").  Plaintiffs allege that the Home Depot defendants "taught and required [the Sales Professional] to accurately measure the cabinet space that will be resurfaced."  SAC ¶ 24.  Plaintiffs appear only to seek to obtain the benefit of the second measurement Target Selling Price only when it is lower than the Contract Selling Price set forth in the contract.

1    representation when it has not."

2         Defendants assert that the contracts at issue here do not specify that any quantity

3    of materials will be provided.  Further, defendants argue that to prove a violation of Cal.

4    Civ. Code § 1770(a)(16), plaintiffs must show that defendants made two distinct

5    representations–one before and one after the merchandise contracted for was provided.

6    Defendants argue that both of the alleged representations were made before the products

7    were provided.  According to defendants, the SAC confirms this by alleging that

8    Measurement Technician represented to plaintiffs that a specific quantity of materials

9    "'*will* be provided.'"  Mot. at 24 (emphasis in original) (quoting SAC ¶ 99).

10        In response, plaintiffs argue that defendants falsely represent that the Contract

11   Price reflects the actual quantity of products and services to be provided, and thus, that

12   the sales price is based on an accurate calculation of the goods and services to be

13   provided.  Plaintiffs contend that the second, subsequent misrepresentation is in the

14   form of an omission: defendants fail to disclose the overcharge.  Plaintiffs argue that

15   this second omission "begins at the time of the Measurement Technician's subsequent

16   calculations and continues through today, which is well after the 'transaction has been

17   supplied.'"  Opp'n at 24 (quoting Mot. at 24).

18        For the reasons stated above with respect to plaintiffs' UCL and Cal. Civ. Code §

19   1770(a)(5) claims, the Court concludes that plaintiffs have failed to state a claim under

20   Cal. Civ. Code § 1770(a)(16).

21                  **3.      FOURTH CLAIM FOR RELIEF**

22                       **a.      BREACH OF CONTRACT**

23

24        In their fourth claim, plaintiffs seeks relief for breach of contract.  Plaintiffs must

25   plead four elements for a breach of contract claim: "(1) a contract; (2) plaintiff[s']

26   performance or excuse for nonperformance; (3) defendant[s'] breach; and (4) damage to

27   plaintiff[s]."  B.E. Witkin, 4 Cal. Procedure Pleading § 476 (4th ed. 1997) (internal

28   citations omitted).

Defendants assert that the gravamen of plaintiffs' breach of contract claim is that defendants charged plaintiffs for a specific quantity of goods, failed to provide plaintiffs with said quantity, and failed to refund any money to them.  However, defendants assert that the parties did not agree that a specific quantity of materials would be provided to plaintiffs.  Defendants argue that neither the preamble to the "Specifications" page nor the "Change and Change Orders" paragraph in the "General Terms and Conditions" page can be used to imply a quantity term.  Additionally, defendants argue that plaintiffs cannot rely on the Retail Price List to imply a quantity term because the Retail Price List was not incorporated by reference into the contract.

Plaintiffs respond that the Court should unbundle the components of the total price and distinguish between the goods and services provided.  Plaintiffs argue that the contracts expressly contemplate a refund in purchase price if products are paid for, but not delivered.  Specifically, plaintiffs argue that the "Returns" clauses[6] of their contracts "contemplate a 'purchase price' for cabinet products, which must be refunded if those products were 'incorrectly ordered.'"  Opp'n at 11.  Based on the "Change and Change Orders" clauses in the "General Terms and Conditions,"[7] plaintiffs argue that the

---

[6] The "Returns" clauses provide as follows

Special order merchandise that is custom made, i.e., uniquely altered, color-matched, shaped, sized, or otherwise designed or fitted to accommodate the requirements of a particular space or environment (some representative examples are cabinetry, countertops, floor coverings, tiling, and window treatments) is non-returnable and its purchase price cannot be refunded unless incorrectly ordered by Home Depot or Professional, or unless damaged beyond repair in delivery or by Professional.

SAC, Exs. C (Spiegler Contract) and E (Bouskila Contract) at 2.

[7] The "Changes and Change Orders" clauses provide, inter alia,

Home Depot, at Your request may arrange for Professional to perform
(continued...)

21

contracts refer to discrete cabinet products that will be provided on a per-unit basis. Plaintiffs argue that accordingly, the "Change Order clause[s] expressly require[] a price adjustment to reflect both the actual type and quantity of products that will be installed." Id.

Plaintiffs concede that the contracts do not expressly identify any quantity of materials to be sold.  Plaintiffs argue that, however, the parties "had a precise quantity of materials in mind when they entered into the contracts –specifically, the quantity necessary to re-face Plaintiffs' kitchens." Id. at 12.  Plaintiffs argue that under defendants' interpretation of the contracts, there is no way to know "whether Defendants were required to reface half the kitchen, all of the kitchen or perhaps the pantry as well, because the contracts are silent on both the quantity and scope." Id. Plaintiffs assert that the contracts contemplate the sale of such discrete items as 'Clear Glass door(s),' 'Valence[s]' and 'Heat Shield[s].'" Id.  Based thereon, plaintiffs argue that although the contracts do not identify a quantity of these items, when the parties entered into the contract, they expected that a specific quantity of materials would be provided.  Plaintiffs argue that, for example, customers would expect to be refunded if they ordered two heat shields, but only received one.

Finally, plaintiffs argue that they should be permitted to introduce extrinsic evidence to demonstrate the parties' intentions in entering into the contracts.

In their reply, defendants argue that the parties could not have known the specific

---

[7](...continued)
additional work, subject to a Change Order, subject to additional charges payable by You to Home Depot.  Any changes to Installation, i.e., a substitution of materials or *an expansion of the scope of the work*, will require You, Home Depot and Professional to first sign a written Change Order that will become part of this Agreement.  Any Change Order must be clear in scope and specify any additional payment(s) . . . .

Id. at 3 (emphasis added).

quantity of products that would be necessary to complete a particular job until after the work has been completed.  Defendants further argue that the contracts refer only to the scope of the work to be completed, i.e., refacing of cabinets in plaintiffs' kitchens. Defendants assert that the contract prices reflect Sales Professional's initial estimates, and there in no contractual provision requiring them to later modify the contract price. Defendants contend that the "Change Orders" provision refers only to those aspects of the job that are specified in the contract.  For example, it requires that the parties execute a "Change Order" if there is a substitution of materials.  Defendants contend that the "Returns" provision refers only to the scope of the work, and applies when a customer seeks to return certain items.

> By executing their contracts, plaintiffs authorized Home Depot to (a) arrange for Installation Professional [an independent contractor authorized by Home Depot] to perform Installation [installation services specified in the Special Services/Home Improvement Agreement] and/or (b) order and arrange for the delivery of special order merchandise, including special order merchandise that may be custom made [which is described in the Specification page] . . . .

SAC, Exs. C (Spiegler Contract) and E (Bouskila Contract) at 1-2.

Plaintiffs had fixed-price contracts, which provided (1) for the purchase of cabinets, fixtures, or materials and (2) for the installation of those materials.  Plaintiffs argue that their contracts should have separate price terms for each of these components.

It is undisputed that the contracts here at issue do not expressly require a specific quantity of materials to be provided.  Instead, plaintiffs seek to imply a quantity term. Plaintiffs contend that the "Returns" provisions of the contracts imply a quantity term. However, the "Returns" provision provides only that custom-made goods cannot be returned to defendants unless they were (1) incorrectly ordered or (2) damaged beyond

repair.  Without explanation, plaintiffs argue that "[c]ertainly, consumers are also entitled to a refund of the 'purchase price' for products that were paid for but *never* ordered."  Opp'n at 11.  However, defendants did not promise to provide plaintiffs any specific quantity of materials.  Instead, the parties agreed on the scope of the work to be performed, <u>i.e.</u>, refacing of plaintiffs' cabinets with certain types of materials, and defendants promised plaintiffs to complete that work.  Plaintiffs do not argue that defendants have failed to do so.

Nor does the "Change and Change Order" clause imply a quantity term.  Those clauses provide that if the parties seek to *substitute* materials or to *expand* the scope of the work, then the parties must execute a "Change Order."  SAC, Exs. C (Spiegler Contract) and E (Bouskila Contract) at 3 (emphasis added).  The language is not ambiguous.  The phrase "scope of the work" does not refer to or imply a quantity of products.  Instead, it describes what work is to be performed at plaintiffs' home–in this case, cabinet refacing.  A "Change Order" cannot be required when no provision of the contract requires modification, <u>i.e.</u>, it cannot be required to modify a non-existent quantity term.

Plaintiffs argue that the parties had "a precise quantity of materials in mind when they entered into the contracts."  Opp'n at 11.  Even if plaintiffs had a quantity in mind, their contracts do not indicate this quantity.

The Court concludes that it would be inappropriate to permit plaintiffs to introduce extrinsic evidence since such evidence may not be used to vary or contradict the express terms of their contracts.  <u>See</u> <u>Banco Do Brasil v. Latian</u>, 285 Cal. Rptr. 870, 891 (1991) ("The test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible.") (internal quotations omitted).

Based on the foregoing, the Court concludes the plaintiffs have failed to sufficiently state a claim for breach of contract.

### b.    BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

Defendants urge the Court to dismiss plaintiffs' claim for breach of the implied covenant of good faith and fair dealing.  Defendants argue that plaintiffs' claim for breach of the implied covenant fails because the purpose of the contracts–cabinet refacing–was accomplished.  Additionally, defendants claim that the contracts expressly permitted defendants to charge plaintiffs as they did.  Defendants argue that their internal customer pricing policies and procedures cannot support a claim for breach of the implied covenant.  Defendants further argue that plaintiffs cannot utilize the implied covenant to introduce new contractual terms, i.e., terms requiring defendants to follow their internal pricing policies and procedures in setting the contract price or terms preventing defendants from charging "an additional $250 profit in their bid."  Mot. at 15.  Finally, defendants argue that plaintiffs claim for breach of the implied covenant fails because they in effect seek to have the Court rewrite the terms of the parties' express contracts and to add price terms that are contingent on the quantity of materials provided.

The law implies a covenant of good faith and fair dealing in every contract "to prevent one contracting party from unfairly frustrating the other party's right to receive the *benefits of the agreement actually made*."  <u>Guz v. Bechtel Nat'l, Inc.</u>, 24 Cal. 4th 317, 349 (2000) (emphasis in original).  In California, the following rules govern implied covenants of good faith and fair dealing

> "(1) the implication must arise from the language used or it must be indispensable to effectuate the intention of the parties; (2) it must appear from the language used that it was so clearly within the contemplation of the parties that they deemed it unnecessary to express it; (3) implied covenants can only be justified on the grounds of legal necessity; (4) a promise can be implied only where it can be rightfully assumed that it would have been made if attention had been called to it; (5) there can be no

implied covenant where the subject is completely covered by the contract." Lippman v. Sears, Roebuck & Co., 44 Cal. 2d 136, 142 (1955) (quoting Cousins Inv. Co. v. Hastings Clothing Co., 45 Cal. App. 2d 141, 149 (1941)). The "precise nature and extent of the duty imposed by such an implied promise will depend on the contractual purposes." Egan v. Mut. of Omaha Ins. Co., (1979) 24 Cal.3d 809, 818 (1979). Thus, the implied covenant of good faith and fair dealing "cannot impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement." Guz, 24 Cal. 4th at 349-50.

The purpose of the implied covenant of good faith and fair dealing is to assure compliance with the terms of the parties' contracts. Here, defendants performed their duties according to the express terms of the contract.

Plaintiffs contend that they are not attempting to rewrite their contracts, but rather, that they are seeking to enforce the parties' true intentions. The Court concludes, however, that the parties' express agreement controls what they intended. That express agreement is clear and unambiguous. Plaintiffs have not alleged any conduct that demonstrates defendants' failure or refusal to discharge contractual responsibilities. To the extent that plaintiffs allege that they believed that the contract price would be modified as a result of measurements taken by the Measurement Technician, plaintiffs' beliefs were unreasonable.

Implied covenants "are justified only when they are not inconsistent with some express term of the contract and, in the absence of such implied terms, the contract could not be effectively performed." Tanner v. Title Ins. & Trust Co., 20 Cal. 2d 814, 824 (1942). Because "[i]mplied terms should never be read to vary express terms," Carma Developer v. Marathon Dev., 2 Cal. 4th 342, 374 (1992), this Court concludes that plaintiffs have failed to state a claim for breach of the implied covenant of good faith and fair dealing.

**4.    FIFTH CLAIM FOR RELIEF (REFORMATION OF CONTRACT PURSUANT TO CAL. CIV. CODE § 3399)**

In their fifth claim, plaintiffs "seek an order revising the contracts in such a way that the Contract Selling Price accurately reflects Defendants' standard retail sales price for the products actually delivered and installed, adjusted for any applicable discounts and taxes."  SAC ¶ 115.

Defendants argue that plaintiffs' fifth claim should be dismissed because plaintiffs fail to allege what the parties' real agreements were, how the written contracts failed to express these agreements, how the mistakes in contracting were made, who made the mistakes, or what brought about the mistakes.

In opposition, plaintiffs argue that they entered into contracts with defendants believing that they would be paying only for materials that were actually ordered, delivered, and installed.  Plaintiffs claim that defendants "knew or reasonably suspected" that plaintiffs held these beliefs.  Opp'n at 24.  Plaintiffs argue that accordingly, they have stated claim for reformation based on their unilateral mistakes.

California Civil Code § 3399 provides

> When, through fraud or a mutual mistake of the parties, or a mistake of one party, which the other at the time knew or suspected, a written contract does not truly express the intention of the parties, it may be revised, on the application of a party aggrieved, so as to express that intention, so far as it can be done without prejudice to rights acquired by third persons, in good faith and for value.

The Court agrees with defendants that plaintiffs' claim for reformation is deficiently pled.  See Philips Med. Capital, LLC v. Med. Insights Diagnostics Ctr., Inc., 471 F. Supp. 2d 1035, 1046-47 (N.D. Cal. 2007) ("To state a claim for reformation under California law, a plaintiff must plead that 'by reason of fraud practiced by one of the parties, or of the mutual mistake of the parties or of a mistake of one of them, which the other at the time knew or suspected, there were omitted from the instrument certain material terms and conditions.  In other words, that the language of the writing failed, for some reason, to express the intention of the parties.'") (quoting Pascoe v. Morrison,

219 Cal. 54, 56 (1933)).  Notwithstanding this failure, it is clear that plaintiffs cannot state a claim for which relief may be granted.

The complaint first seeks reformation by reason of the parties' mutual mistakes. "By mutual mistake is meant a situation where both parties share the same misconception."  Renshaw v. Happy Valley Water Co., 114 Cal. App. 2d 521, 524 (1952).  There is no doubt that defendants did not share plaintiffs' misconception. Accordingly, the Court grants defendants' motion to dismiss in this regard.  See Bailard v. Marden, 36 Cal. 2d 703, 708 (1951) ("Courts of equity have no power to make new contracts for the parties, . . . [Nor] can they reform an instrument according to the terms in which one of the parties understood it, unless it appears that the other party also had the same understanding.") (internal quotations omitted).

Alternatively, plaintiffs seek to reform their contracts based on their unilateral mistake.  In order to be granted reformation plaintiffs must show that they made a mistake at the time of the time of contracting, and that the mistake was known to or suspected by defendants.

Here, plaintiffs allege that they "intended that the Contract Selling Price in each [of their] contract[s] would accurately reflect Defendants' actual retail price for the products sold and installed."  SAC ¶ 114.  Plaintiffs further allege that "by reason of unilateral mistakes by Plaintiffs . . . , which Defendants knew or reasonably suspected at the time, Plaintiffs and each Class member entered into contracts reflecting a Contract Selling Price that was greater than Defendants' Target Selling Price, minus the Administrative Fee."  Id. ¶ 115.  However, plaintiffs nowhere allege anything that was said or done that would reflect this new and different agreement or that would have put defendants on notice of plaintiffs' understandings.  "'Although a court of equity may revise a written instrument to make it conform to the real agreement, it has no power to make a new contract for the parties, whether the mistake be mutual or unilateral.'"  Am. Home Ins. Co. v. Travelers Indem. Co., 122 Cal. App. 3d 951, 963 (1981) (quoting Shupe v. Nelson, 254 Cal. App. 2d 693, 700 (1967)).  The Court therefore concludes

that plaintiffs have not stated a claim for reformation of their contracts.

## V.     LEAVE TO AMEND

The Court is mindful of Fed. R. Civ. P. 15(a)'s policy favoring liberal amendment.  See DCD Programs, Ltd. v. Leighton, 833 F.2d 183, 185 (9th Cir. 1987) (stating that leave to amend should be liberally granted).  However, in this case, plaintiffs have amended their complaints twice.  Plaintiffs have been unable to overcome the deficiencies addressed in this Court's prior order.  At the hearing held herein, plaintiffs did not request leave to amend.  Plaintiffs' counsel essentially conceded that if the Court did not find merit to the operative SAC, plaintiffs would not be able to plead additional facts to cure any deficiencies therein.  Thus, it is clear that plaintiffs will not be able to amend their complaint to overcome the deficiencies noted in this order.  Accordingly, the Court finds and concludes that under these circumstances, granting plaintiffs leave to amend would be futile.  See Ascon Properties, Inc. v. Mobil Oil Co., 866 F.2d 1149, 1160 (9th Cir. 1989) ("The district court's discretion to deny leave to amend is particularly broad where plaintiff has previously amended the complaint.").

## VI.    CONCLUSION

In accordance with the foregoing, the Court finds and concludes as follows.

(1)     The Court DENIES defendants' motion to dismiss plaintiffs' SAC pursuant to Fed. R. Civ. P. 9(b).

(2)     The Court GRANTS defendants' motion to dismiss plaintiffs' first,

second, third, and fourth claims for relief without leave to amend.

IT IS SO ORDERED.

Date: June 30, 2008

_____
CHRISTINA A. SNYDER
UNITED STATES DISTRICT JUDGE